UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
WILLIAM C. DUFFELMEYER, MICHAEL
WALTHER, STEVEN HEISLER, JEFF NARDI,          07 Civ. 2807 (WP4) (MDF)
STEPHEN M. CARPINIELLO, EDWARD
ARCE, RALPH TANCREDI, PETER
DeVITTORIO, MICHAEL MARINELLI,
and ARTHUR MARINELLI,

                    Plaintiffs,

       -against-

LAWRENCE MARSHALL, individually,
DAVID HALL, individually, and
the TOWN/VILLAGE OF HARRISON,
New York,

                   Defendants.
------------------------------------------------------------------------x

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

LOVETT & GOULD, LLP
Attorneys for Plaintiffs
222 Bloomingdale Road
White Plains, New York 10605
(914) 428-8401

# Table of Contents

**Page**

Table of Authorities ...………………………………………………………iii

Preliminary Statement…...……………………………………...……………..………1

Background…………………………………………………………………...1

    I.      The Parties………………………………………………………....1

    II.    Plaintiffs' expressions of opinion on a matter of
           public concern………………………………………………………1

    III.    The unlawful gag order……………………………………………4

           A. The gag order issued in groups to Duffelmeyer,
           Heisler, Nardi, Arce, M. Marinelli and A. Marinelli…………………4

           B. The gag order issued on a one-on-one basis to Walther,
           Carpiniello, Tancredi and DeVittorio…………………………………5

           C. The determination to issue the gag order……………………………5

    IV.    Each of the Plaintiffs complied with the order of their
           superior and thus have been chilled in the exercise of
           their rights as guaranteed by the First Amendment…………………....6

    V.     The District Attorney's investigation concluded by no
           later than May 24, 2007…………………………………………...7

    VI.    Defendants' unlawful motives are apparent………………………8

POINT I
    DEFENDANTS' MOTION MUST BE DENIED SINCE IT IGNORES
    THE STANDARDS GOVERNING MOTIONS TO DISMISS…………………8

POINT II
    DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST
    AMENDMENT CHILLING CLAIM SHOULD BE DENIED
    ON THE MERITS……………………………………………………12

    A. There is no dispute that Plaintiffs' meet the first and second

elements of their claim……………………………………………………...12

B. As plead in the Complaint, and supported by Plaintiffs' affidavits,
Plaintiffs' First Amendment rights have been unlawfully chilled………………14

C. Defendants' reliance on the Pickering balancing test
is misplaced …………………………………………………………………...16

D.  Defendants' asserted legitimate justification for gagging Plaintiffs'
exercise of their First Amendment rights is not supported by any proof
and in any event is disputed…………………………………………………...19

POINT III
    DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY
    OR DISMISSAL OF THE LAWSUIT AGAINST HALL………………………...21

A.  The individual defendants are not entitled to qualified immunity…………..21

B.  The Claims against Chief Hall should not be dismissed……………………..23

POINT IV
    THE TOWN/VILLAGE OF HARRISON IS A PROPER
    DEFENDANT………………………………………………………………....24

Conclusion…………………………………………………….………………25

## TABLE AUTHORITIES

**Cases**                                                                                                    **Page**

Aebisher v. Ryan, 22 F.2d 651 (2nd Cir. 1980)...............................................14

Bernheim v. Litt, 79 F.3d 318 (2nd Cir. 1996)............................................11, 13

Clue v. Johnson, 179 F.3d 57 (2nd Cir. 1999).............................................24

Curley v. Suffern, 268 F.3d 65 (2nd Cir. 2001)..........................................12

Duncan v. Keane, 1995 WL 649931 (S.D.N.Y. 1995)................................23

Grennan v. Nassau County, 2007 WL 952067 (E.D.N.Y. 2007)..............10, 13

Harman v City of New York, 140 F.3d 111 (2nd Cir. 1998)..............16, 17, 19

Hernandez v Coughlin, 18 F.3d 133 (2nd Cir. 1994), *cert. denied,*
    513 U.S. 836 (1994)..................................................................9-10

Johnson v. Ganim, 342 F.3d 105 (2nd Cir. 2003)........................................22

Latino Officers Association v. Safir, 170 F.3d 167 (2nd Cir. 1999)..............18

Laurentano v. Spada, 339 F.Supp.2d 391 (D.Conn. 2004).........................11, 13

Litzler v. CC Investments, LLC, 362 F.3d 203 (2nd Cir. 2004).....................9

Locurto v. Safir, 264 F.3d 154 (2nd Cir. 2001)..........................................22

Mandell v. County of Suffolk, 316 F.3d 368 (2nd Cir. 2003)........................24

Melnitzky v. Rose, 299 F.Supp.2d 219 (S.D.N.Y. 2004)................................8

Milwaukee Police Association v. Jones, 192 F.3d 742 (7th Cir. 1999)..............16

Nichols v. Village of Pelham Manor, 974 F.Supp. 243 (S.D.N.Y. 1997)..........17, 18, 23

Okwedy v. Molinari, 333 F.3d 339 (2nd Cir. 2003)......................................15

Peres v. Oceanside Union Free Sch. Dist., 426 F.Supp.2d 15 (E.D.N.Y. 2006).......11, 13

Piesco v. New York City Department of Personnel, 933 F.2d 1149
    (2d Cir. 1991), *cert. denied* 112 S.Ct. 331(1991)......................................21

Rucci v. Thoubboron, 68 F.Supp.2d 311 (S.D.N.Y. 1999)……………………………..…24

Sykes v. James, 13 F.3d 515 (2nd Cir. 1993), *cert. denied*, 512 U.S. 1240 (1994)………..9

Weyant v Okst, 101 F.3d 845 (2nd Cir. 1996)……………………………………………....22

Zieper v. Metzinger, 474 F.3d 60 (2nd Cir. 2007)…………………………………………..14

## PRELIMINARY STATEMENT

Plaintiffs commenced the instant action due to the unlawful chilling of their First Amendment rights which chilling resulted from the jointly engaged-in conduct taken by Defendants while acting under color of the laws of the State of New York (Complt. ¶1).

Defendants' move pre-discovery to dismiss the Complaint pursuant to FRCP Rule 12(b)(6). For the reasons set forth *infra*, Defendants' motion should be denied.

## BACKGROUND

### I. The Parties

Plaintiffs William C. Duffelmeyer, Michael Walther, Steven Heisler, Jeff Nardi, Stephen M. Carpiniello, Edward Arce, Ralph Tancredi, Peter DeVittorio, Michael Marinelli, and Arthur Marinelli are each employed as a sworn member of the Police Department of the Defendant Town/Village of Harrison (see Complt. ¶3, annexed to Berg Aff. as Ex. 13).

At all times relevant, Defendant Lawrence Marshall was employed as a Lieutenant and Defendant David Hall as the Chief of Police of the Department (Complt. ¶¶4 and 5).

### II. Plaintiffs' expressions of opinion on a matter of public concern

On March 28, 2007, and as members/officers of the Harrison Police Association, Plaintiffs Duffelmeyer, Heisler, Carpiniello, Tancredi, Walther, Arce, and DeVittorio advised the members of the Town's Board of Police Commissioners and Police Captain Anthony Marraccini in writing about a "disturbing set of circumstances that may constitute the possible commission of a crime..." (Complt. ¶7).

The written communication to the Board of Police Commissioners and Captain Marraccini continued:

"In January, 2007, [PBA] President Tancredi was conducting a customary examination of the many donations the Harrison Police Association receives during the Christmas holiday season. Pursuant to his examination, President Tancredi noticed that Brae Burn Country Club, as well as other donors, had not sent their customary annual donation. He inquired with the administration at Brae Burn CC as to whether they had sent or were going to send their annual donation for 2006. The administration said that they had made a donation of $2,500.00 and that the check was personally picked up by Chief Hall at Brae Burn CC. The Brae Burn CC administration said that they would look into the matter and get back to President Tancredi. President Tancredi and other members of the [PBA'S] executive board were contacted a short time later and the Brae Burn CC administration was disturbed to find out that the check had been altered and the funds had been deposited in the New York State Chiefs of Police Association account (Chief Hall was the President of the Chiefs Association at the time). The Brae Burn administration was very clear with President Tancredi that the check was made out to the Harrison Police Association and was intended to be a charitable donation to the Harrison Police Association (see enclosed copy of check). Brae Burn said they received a receipt (see enclosed copy) for an advertisement in the Chiefs of Police Association Journal a short time after Chief Hall picked up the check, but apparently Chief Hall never discussed the advertisement with the Brae Burn charitable donation committee and Brae Burn did not authorize anyone to cross out Harrison in the payee line and replace it with Chiefs. They also said they were very surprised when they saw that

2

the funds had gone to the Chiefs of Police Association and not the Harrison Police Association.

President Tancredi, under his belief that a mistake had been made, discussed the matter with the Association's executive board and some other members of the Association. Vice President Michael Walther subsequently asked Chief Hall if he had any checks or donations that were intended for the Harrison Police Association. The hope was that a mistake had been made. In the past, some donations that were intended for the Association had been mistakenly deposited into the Town of Harrison accounts and reimbursements by the Town were made to the Association when the errors were made apparent. Chief Hall, however, informed Vice President Walther that he did not have any checks or any funds that were intended for the Association.

. . .[T]he [PBA] members concluded that it was possible that the Brae Burn donation check may have been intentionally altered and redirected into the Chiefs of Police account. As this would constitute a criminal act, it [is] the understanding of the members of the Association with knowledge of this possible crime that we have an obligation to report the incident to the Harrison Police Department. . .We respectfully request that you investigate this matter on our behalf. . .It is also our understanding that if we are not comfortable or disagree with the results of your investigation, we reserve the right as potential crime victims to pursue the matter with another law enforcement agency." (Complt. ¶7; March 28, 2007 letter annexed to Complaint).

As indicated in the March 28, 2007 correspondence, Plaintiff Tancredi was specifically advised by several individuals from the Brae Burn County Club, including Marie Conte (Comptroller) and Bob Meyers (General Manager) that Chief David Hall was the individual who picked up check #1013 in the amount of $2500.00 (Tancredi Aff. ¶2; Berg Aff. Ex. 13).[1]

Furthermore, Plaintiff Walther was similarly, personally advised by Karen Williams of the Brae Burn Country Club that Chief Hall was the individual who picked up that check (Walther Aff. ¶2).

### III. The unlawful gag order

Within days of the March 28, 2007 correspondence, Defendant Marshall and Captain Marraccini at the direction of Chief Hall personally advised each of the Plaintiffs that they were **ordered** to silence and were henceforth forbidden to communicate **with anyone altogether** about the matters contained in their March 28th correspondence (Complt. ¶9; Duffelmeyer Aff. ¶¶2-3; Walther Aff. ¶3; Heisler Aff. ¶¶2-3; Nardi Aff. ¶¶2-3; Carpiniello Aff.¶2; Arce Aff. ¶¶2-3; Tancredi Aff. ¶3; DeVittorio Aff. ¶2; M. Marinelli Aff. ¶¶2-3; A. Marinelli Aff. ¶¶2-3).

As to the scope of the gag order, when Tancredi inquired as to the scope of this order, Marshall advised that the order was very broad in that he was precluded from speaking with anyone at all, including both internally and outside the department (Tancredi Aff. ¶3).

### A. The gag order issued in groups to Duffelmeyer, Heisler, Nardi, Arce, M. Marinelli and A. Marinelli

In connection with the issuance of the aforementioned gag order, some of the Plaintiffs were ordered into a meeting conducted by both Defendant Marshall and Captain Marraccini. At their respective meetings, both Marshall and Marraccini ordered the Plaintiffs in attendance not

---

[1] Each of the Plaintiffs' affidavits are annexed to the Affidavit of Kim Berg, as follows: Duffelmeyer affidavit as Ex. 1; Walther affidavit as Ex. 2; Heisler affidavit as Ex. 3; Nardi affidavit as Ex. 4; Carpiniello affidavit as Ex. 5; Arce affidavit as Ex. 6; Tancredi affidavit as Ex. 7; DeVittorio affidavit as Ex. 8; M. Marinelli affidavit as Ex. 9; and A. Marinelli affidavit as Ex. 10.

to speak to anyone about the matters contained in the March 28th correspondence (Duffelmeyer Aff. ¶3; Heisler Aff. ¶3; Nardi Aff. ¶3; Arce Aff. ¶3; M. Marinelli Aff. ¶3; A. Marinelli Aff. ¶3).

Those same Plaintiffs were also given a packet containing numerous questions which they were ordered to answer concerning the $2500.00 check, what they knew about the circumstances surrounding the issuance and cashing of the check, who they told about the incident, and who else was aware of any facts pertaining to the incident (Duffelmeyer Aff. ¶5; Heisler Aff. ¶5). After completing the answers to these questions in compliance with the orders issued by their superiors, some of the Plaintiffs were then directed by Captain Marraccini and Defendant Marshall, in what at least one perceived to be a threatening manner, to change their answers (Duffelmeyer Aff. ¶6; Heisler Aff. ¶6).

At the meeting attended by Plaintiffs Duffelmeyer, Hesiler and Arce, when Plaintiff Arce requested permission to speak to an attorney, permission was denied (Duffelmeyer Aff. ¶4; Heisler Aff. ¶4; Arce Aff. ¶4).

**B. The gag order issued on a one-on-one basis to Walther, Carpiniello, Tancredi and DeVittorio**

Some of the Plaintiffs were ordered to silence individually, either in person or by telephone, by Defendant Marshall and/or Captain Marraccini (Walther Aff. ¶3; Carpiniello Aff. ¶2; Tancredi Aff. ¶3; DeVittorio Aff. ¶2).

**C. The determination to issue the gag order**

When Marshall personally advised Tancredi of the gag order, Marshall specifically stated that he was "directed" to issue that order. At that time, the only individuals higher in the chain of command than Marshall were Captain Anthony Marraccini and Chief David Hall (Tancredi Aff. ¶4).

5

**IV. Each of the Plaintiffs complied with the order of their superior and thus have been chilled in the exercise of their rights as guaranteed by the First Amendment**

Each of the Plaintiffs, having been personally directed by their superior officer not to discuss anything pertaining to the subjects contained in the March 28th correspondence understood that if the order was not complied with they could and in fact would be the subject of disciplinary charges for failing to obey a direct order and/or insubordination (Complt. ¶11; Duffelmeyer Aff. ¶7; Walther Aff. ¶4; Heisler Aff. ¶7; Nardi Aff. ¶4; Carpiniello Aff. ¶3; Arce Aff. ¶7; Tancredi Aff. ¶5; DeVittorio Aff. ¶3; M. Marinelli Aff. ¶4; A. Marinelli Aff. ¶4).

Each of the Plaintiffs has fully complied with the order silencing their speech (Duffelmeyer Aff. ¶8; Walther Aff. ¶5; Heisler Aff. ¶8; Nardi Aff. ¶5; Carpiniello Aff. ¶4; Arce Aff. ¶7; Tancredi Aff. ¶6; DeVittorio Aff. ¶4; M. Marinelli Aff. ¶5; A. Marinelli Aff. ¶5).

Thus, as a proximate result of Defendants' jointly engaged in conduct, each of the Plaintiffs has been actually chilled in the current and prospective exercise of their rights to engage in protected speech and petition the government for the redress of grievances (Complt. ¶12; Duffelmeyer Aff. ¶8; Walther Aff. ¶5; Heisler Aff. ¶8; Nardi Aff. ¶8; Carpiniello Aff. ¶5; Arce Aff. ¶7; Tancredi Aff. ¶8; DeVittorio Aff. ¶4; M. Marinelli Aff. ¶5; A. Marinelli Aff. ¶5).

And with respect to their right of association, the March 28th letter was written as "members of the Association" and in their capacity as such in an effort to find out what happened with regard to the $25000 donation attended for their union. Thus, their right to associate has also been directly impacted.

Further, with respect to Plaintiffs Tancredi, Walther and Arce, they have been chilled with respect to their rights to associate with the union as officers of the union.

Plaintiff Tancredi, as the Union's President, has certain responsibilities with respect to funds and accounting for same on behalf of the union. Not only is he precluded from notifying

the membership of the status of the donation but on several occasions he has been specifically asked by other union members as to the status of the $2500 donation and he has been prohibited from discussing this matter in the context of his association with that union (Tancredi Aff. ¶7).

Similarly, Plaintiff Arce, as a member of the Board of the Association, has the responsibility to advise the union's membership of actions taken by the union and on matters pertaining to issues such as funding or donations.  As a result of the gag order, his rights to associate have directly been impeded (Arce Aff. ¶12).

Likewise, Plaintiff Walther, as Vice President of the Union, was responsible for advising the membership of the circumstances surrounding the $2500.00 donation from Brae Burn County Club. He was prevented from doing so and is still being prevented from discussing the matter as a result of the aforementioned order to silence him (Walther Aff. ¶6).

## V. The District Attorney's investigation concluded by no later than May 24, 2007

As alleged by Defendants in support of their motion to dismiss this action, the District Attorney's office purportedly conducted an investigation into the matters contained in the March 28, 2007 correspondence.  In that connection, Assistant District Attorney Michael F. Hughes sent a letter to the Town/Village on May 24, 2007 concluding that Chief Hall did not engage in any criminal activity (Reinharz Aff. Ex. A).

Despite the fact that the investigation has been concluded, the order gagging Plaintiffs' free speech rights, right to petition, and impairment of their right to associate continues.  Put differently, the gag order has not been lifted or in any way modified and thus the prohibition on Plaintiffs exercise of their First Amendment rights continues (Duffelmeyer Aff. ¶11; Walther Aff. ¶ ; Heisler Aff. ¶11; Nardi Aff. ¶8; Carpiniello Aff. ¶6; Arce Aff. ¶11; Tancredi Aff. ¶11; DeVittorio Aff. ¶7; M. Marinelli Aff. ¶8; A. Marinelli Aff. ¶8).

## VI. Defendants' unlawful motives are apparent

Approximately two to three weeks ago, Defendant Hall advised Plaintiff Duffelmeyer with respect to the "twelve" members of the Department that signed the March 28th correspondence that they "should be scared". He accused Plaintiff Duffelmeyer, by reason of his signing the March 28th letter, of having "no loyalty" and also threatened to "sue you guys" – referring to those members of the Harrison Police Association who signed the letter (Duffelmeyer Aff. ¶12).

In addition, Plaintiff Walther was advised by Captain Marraccini in Chief Hall's presence that "they" were going to prefer disciplinary charges against Walther because he signed the March 28, 2007 letter to the Board of Police Commissioners. According to Marraccini, again in Hall's presence, they instead decided that he (Walther) would receive a letter criticizing his (Walther's) actions (Walther Aff. ¶12).

Further, since the filing of the instant lawsuit, and on or about May 4, 2007, Chief Hall stated to Plaintiff Walther the he was "disappointed" in the fact that Walther was a party to the instant lawsuit and accused Plaintiff Walther of being a "wedge" in the Department (in other words someone who was dividing the Department) (Walther Aff. ¶13).

## ARGUMENT

### POINT I

### DEFENDANTS' MOTION MUST BE DENIED SINCE IT IGNORES THE STANDARDS GOVERNING MOTIONS TO DISMISS

It is axiomatic that, in connection with a motion to dismiss, the facts set forth in the complaint must be deemed true and all inferences as to those facts must be drawn in favor of the non-moving party. Melnitzky v. Rose, 299 F.Supp.2d 219, 223 (S.D.N.Y. 2004), *citing* Levy v. Southbrook Inter'l Invs. Ltd., 263 F.2d 10. 14 (2nd Cir. 2001); Hernandez v. Coughlin, 18 F.3d

133, 136 (2d Cir. 1994), *cert. denied*, 513 U.S. 836 (1994); Sykes v. James, 13 F.3d 515, 519 (2d

Cir. 1993), *cert. denied*, 512 U.S. 1240 (1994).

It is equally well settled that a complaint may only be dismissed when it appears beyond

any doubt that the Plaintiff cannot prove any set of facts in support of his claims which would

entitle him to relief. Litzler v. CC Investments, LLC, 362 F.3d 203, 206 (2nd Cir. 2004).

Here, Defendants' pre-discovery motion to dismiss ignores these well-settled standards

governing motions to dismiss since the motion not only fails to accept the factual allegations in

the Complaint as true but it relies on matters outside the pleadings.[2]

By way of example, Defendants wholly ignore in their motion papers the actual

allegations in the Complaint that state each of the Plaintiffs were specifically ordered to silence

and that each of them understood by reason of that order from a supervisor that if they failed to

comply with the order disciplinary action would result (Complt. ¶11).

Nonetheless, should there be any doubt as to Plaintiffs' understanding as to what an order

from a superior meant, each have submitted an affidavit explaining their belief that if they failed

to comply with this order from a superior officer they would be the subject of disciplinary

charges on the ground of failure to obey a supervisor's direct order and/or insubordination

(Duffelmeyer Aff. ¶7; Walther Aff. ¶4; Heisler Aff. ¶7; Nardi Aff. ¶4; Capriniello Aff. ¶3; Arce

Aff.¶ 7; Tancredi Aff. ¶5; DeVittorio Aff. ¶3; M. Marinelli Aff. ¶4; A. Marinelli Aff. ¶4).

By way of further example, Defendants' motion ignores the facts plead with respect to

Defendants Hall and Marshall acting together with Captain Marraccini in ordering and

conveying the order gagging Plaintiffs' speech (Complt ¶¶ 8-9, 11-12).

---

[2] Thus, Plaintiffs too have relied on matters outside the pleadings, namely their affidavits, to show the validity of their First Amendment chilling claim. The facts contained therein would of course been the subject of discovery had any occurred prior to the making of the instant motion.

And by way of further example, rather than rely on the factual allegations plead in the Complaint as they are required to do in connection with their 12(b)(6) motion to dismiss, Defendants go beyond the four corners of the pleadings in an attempt to claim they had a legitimate basis for issuing the gag order – namely to protect an on-going confidential investigation and avoid disruption to the Department's operations. *See* Defendants' Memorandum of Law, pp. 9-18.

Unfortunately for Defendants, not only does their argument defy the standards governing motions to dismiss, but the supposedly legitimate reason for gagging Plaintiffs' First Amendment activities is: (1) completely unsupported by way of any affidavit or other evidence; and (2) contradicted by the fact that the "investigation" has been concluded for six weeks or more, yet the gag order continues – as evidenced by the only exhibit to the Defendants' motion – namely ADA Hughes May 24, 2007 letter to the Town/Village.

Clearly, the Court cannot credit as "evidence" the self-serving supposedly legitimate basis for the gag order when those assertions are made solely by counsel in his memorandum of law and which in fact are disputed on even the instant bare-bones record. *See* Point II, *infra*.

Finally, to the extent Defendants question Plaintiffs' motives in sending the communication to the Town/Village on March 28, 2007, that argument also not only violates the standards governing 12(b)(6) motions to dismiss but it is completely irrelevant. For the law is clearly established that complaints about improper governmental actions and illegal conduct, such as those contained in the Plaintiffs letter to the Captain and Board, clearly implicate matters of manifest public concern **regardless of the motive of the speaker**. *See* Grennan v. Nassau County, 2007 WL 952067 (E.D.N.Y. 2007), *citing* Burkybile v. Bd. of Educ. of Hastings-on-Hudson Union Free Sch. Dist., 411 F.3d 306, 313 (2nd Cir. 2005) ("Public accusation of

improper governmental actions are clearly matters of public concern, regardless of whether the accuser is motivated by personal reasons."); Bernheim v. Litt, 79 F.3d 318, 325 (2nd Cir. 1996) ("plaintiff's statements to authorities regarding principal's falsification of test scores and of student achievement were matters 'of serious interest to the community.'"); Peres v. Oceanside Union Free Sch. Dist., 426 F.Supp.2d 15 (E.D.N.Y. 2006) ("plaintiff's claim that she reported illegal conduct of the District and its officials adequately alleged matter of public concern entitled to First Amendment protection"); Laurentano v. Spada, 339 F.Supp2d 391, 410 (D.Conn. 2004) ("A corrupt or otherwise improper decision is the most obvious example of an instance where the employee's comment upon the decision would necessarily be of public concern and courts have vigilantly protected an employee's right to expose public misconduct.").

Defendants' argument regarding the factual basis for the March 28th letter's contents simply presents a question of fact nonetheless. For as alleged in the Complaint, Plaintiffs Tancredi and Walther received information directly from the Brae Burn Country Club's administration that Chief Hall personally picked up the $2500 check that was made payable to the Harrison Police Association, the check was altered by changing the name of the payee, and that change was not authorized by Brae Burn CC (Complt ¶7).

Since Defendants have gone beyond the four corners of the complaint, and as evidence showing their good faith basis for the statements contained in the March 28, 2007 letter, the affidavit of PBA President Ralph Tancredi swears that he was personally advised by the Brae Burn County Club administration, namely the Comptroller and General Manager, that Chief Hall personally picked up the check made payable to the Harrison Police Association. In addition, he was advised that the Brae Burn administration "was disturbed to find out that the check had been altered and the funds have been deposited in the New York State Chiefs of Police Association

11

account" and that "Brae Burn did not authorize anyone to cross out Harrison in the payee line and replace it with Cheifs." (Tancredi Aff. ¶2).[3]

In addition, the affidavit of Plaintiff Walther swears the he too was advised by Brae Burn, namely Karen Williams, that Chief Hall was the individual who picked up the check in question (Walther Aff. ¶2).

Thus, not only does Defendants' motion violate the standards governing a motion to dismiss but the facts asserted are either wholly unsupported in the record or significantly disputed. For these reasons, Defendants' motion must be denied.

## POINT II

## DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDMENT CHILLING CLAIM SHOULD BE DENIED ON THE MERITS

To state a chilling claim, Plaintiffs must show that they: (1) had an interest protected by the First Amendment; (3) Defendants' actions were motivated by the exercise of that right; and (3) Defendants' actions effectively chilled the exercise of Plaintiffs' First Amendment rights. Curley v. Suffern, 268 F.3d 65, 73 (2nd Cir. 2001), *citing* Connell v. Signoracci, 153 F.3d 74, 79 (2nd Cir. 1998).

### A. There is no dispute that Plaintiffs meet the first and second elements of their claim

Here, Defendants do not contest that Plaintiffs Complaint meets the first two elements.

Nor could there be any no serious dispute that Plaintiffs had and continue to have a First Amendment interest in expressing their opinions individually and as members/officers of the union on the matter of manifest public concern contained in their March 28th correspondence.

---

[3] Assistant District Attorney Hughes' letter to the Town/Village further confirms that: (1) the check in question was originally made payable to the Harrison Police Association in the amount of $2500.00 and that the check was altered "from the Harrison Police Association to the Chief Police Association." ; and (2) the "President of BBCC, Seth Blumenfeld, has stated that the BBCC Charity Committee was never approached by then General Manager Robert Meyer about a proposed donation or solicitation on behalf of NYSACOP. Moreover, Meyer did not have the authority from the BBCC to contract with NYSACOP for the ad/donation." (Reinharz Aff. Ex. A).

*See e.g.*, Grennan v. Nassau County, 2007 WL 952067 (E.D.N.Y. 2007), *citing* Burkybile v. Bd. of Educ. of Hastings-on-Hudson Union Free Sch. Dist., 411 F.3d 306, 313 (2nd Cir. 2005) ("Public accusation of improper governmental actions are clearly matters of public concern...."); Bernheim v. Litt, 79 F.3d 318, 325 (2nd Cir. 1996) ("plaintiff's statements to authorities regarding principal's falsification of test scores and of student achievement were matters 'of serious interest to the community.'"); Peres v. Oceanside Union Free Sch. Dist., 426 F.Supp.2d 15 (E.D.N.Y. 2006) ("plaintiff's claim that she reported illegal conduct of the District and its officials adequately alleged matter of public concern..."); Laurentano v. Spada, 339 F.Supp2d 391, 410 (D.Conn. 2004) ("A corrupt or otherwise improper decision is the most obvious example of an instance where the employee's comment upon the decision would necessarily be of public concern....").

Similarly, with respect to the second element of their claim, since the gag order was aimed only at the Plaintiffs hours after they signed and delivered the March 28, 2007 letter, it is patently clear Defendants were motivated to act by Plaintiffs' exercise of their First Amendment rights to speak on matters of public concern, petition the government for the redress of grievances, and associate with their union (Complt. ¶¶8-9).[4]

In addition to the timing of the gag order, since this action was filed, and as will be revealed during discovery, Defendants' retaliatory motives are apparent.

For example, approximately two to three weeks ago, Defendant Hall advised Plaintiff Duffelmeyer with respect to the "twelve" members of the Department that signed the March 28th correspondence that they "should be scared". He accused Plaintiff Duffelmeyer, by reason of his

---

[4] In fact, there has been press coverage with respect to the District Attorney's conclusions. Yet, Plaintiffs are the only ones still prohibited from speaking about the matters.

signing the March 28th letter, of having "no loyalty" and also threatened to "sue you guys" – referring to those who signed the letter (Duffelmeyer Aff. ¶12).

In addition, Plaintiff Walther was advised by Captain Marraccini in Chief Hall's presence that "they" were going to prefer disciplinary charges against Walther because he signed the March 28, 2007 letter but instead they would be issuing him a letter criticizing his actions (Walther Aff. ¶12).

Further, since the filing of the instant lawsuit, and on or about May 4, 2007, Chief Hall stated to Plaintiff Walther the he was "disappointed" in the fact that Walther was a party to the instant lawsuit and accused Plaintiff Walther of being a "wedge" in the Department (Walther Aff. ¶13).

## B. As plead in the Complaint, and supported by Plaintiffs' affidavits, Plaintiffs' First Amendment rights have been unlawfully chilled

With respect to the third element, "[I]t is well-established that 'First Amendment rights may be violated by the chilling effect of governmental action that falls short of a direct prohibition against speech. Aebisher v. Ryan, 22 F.2d 651, 655 (2nd Cir. 1980). Accordingly, the First Amendment prohibits government officials from encouraging the suppression of speech in a manner which 'can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request." Zieper v. Metzinger, 474 F.3d 60, 65-66 (2nd Cir. 2007).

In the case at bar, Defendants did more than simply suggest to Plaintiffs that adverse action would follow if they spoke about the matters of public concern contained in their March 28th correspondence.  Defendants' issued a direct order from a superior to a subordinate completely prohibiting the ten Plaintiffs here from speaking with anyone whatsoever about the matters contained in the March 28th correspondence.  The ramifications of non-compliance were

patently clear – namely disciplinary charges for insubordination. For in issuing the order they did not tell Plaintiffs that there would be no ramifications or consequences if they failed to comply. Under the circumstances, and viewing the facts in the light most favorable to plaintiffs, it is clear that the gag order contained more than a veiled threat of reprisal. *See* Okwedy v. Molinari, 333 F.3d 339, 343-344 (2nd Cir. 2003) (reversing District Court's judgment dismissing chilling claim on a 12(b)(6) motion to dismiss for failure to view the words used in the light most favorable to plaintiff). [5]

Thus, Plaintiffs have been chilled from speaking out on this matter of manifest public concern as private individuals, members of the Department, and union members. They have been prohibited from speaking with each other, other citizens, members of the Department, members of the union, any law enforcement agencies, and *inter alia*, the press.

As a result they have also been precluded from referring the factual information they are aware of to a law enforcement agency or other governmental authority that could find out the circumstances of the altered check. In other words, the Board referred the matter to the District Attorney's office who was unable to find out the identity of the individual who altered the check. Perhaps another agency, such as a police agency, could figure out who perpetrated this criminal act. However, as a result of the unlawful gag order, Plaintiffs have been prohibited from reporting a possible crime to an agency for investigation and findings and from seeking restitution on behalf of the union.

---

[5] This of course distinguishes this case from those cited by Defendant in which only implied threats were made in an effort to silence speech. For here, Defendants possessed the direct decision making authority over the Plaintiffs. *See e.g.* Okwedy, 333 F.3d at 343-344 ("a public official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights, regardless of whether the threatened punishment comes in the form of the use (or, misuse) of the defendant's direct regulatory or decision making authority over the plaintiff, or in some less-direct form.").

Thus, as citizens, employees and members/officers of the Association, their First Amendment rights have been violated.

## C. Defendants' reliance on the Pickering balancing test is misplaced

In connection with the total ban imposed here on a group of individuals (in their capacities as citizens, employees of the Department and members of the association who had the ultimate right to seek restitution for the theft of $2500 from their union) the Defendants improperly rely on the Pickering balance test. *See* Milwaukee Police Association v. Jones, 192 F.3d 742, 750 (7th Cir. 1999) (in cases where a total ban on future speech is imposed, including in public forums, the Pickering balancing test is inapplicable and the "NTEU test" is the appropriate test to apply), *citing* Harman v. City of New York, 140 F.3d 111, 118 (2nd Cir. 1998).

Under the NTEU test, "where the government singles out expressive activity for special regulation to address anticipated harms, the government must 'demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." Harman, 140 F.3d at 121, *citing* NTEU, 513 U.S. at 475 (*quoting* Turner Broad Sys., Inc., v. Federal Communications Comm'n, 512 U.S. 622, 624 (1994) (plurality opinion). To that end, the "government must show a basis it fact for its concerns." Id.

Here, Defendants' motion fails to meet the NTEU standard. For not only do the asserted reasons lack support in the record, but the Defendants have not shown that their asserted reasons, namely to protect a confidential investigation and avoid disruption to the Department's operations, are compelling justifications for the suppression of all speech in all forums, that the asserted "harm" was real, as opposed to mere conjecture, or that the gag order was designed to address the asserted harm in a "direct and material way." *See e.g.* Harman, 140 F.3d at 122-124 (rejecting government's assertions that restriction on speech was valid based on a need to protect

confidential information and promote the efficient and effective operation of the City's

agencies).

Further, "in the context of an overbreadth challenge, a law is facially invalid if it 'does

not aim specifically at evils within the allowable area of control...but sweeps within its ambit

other activities' which are protected by the First Amendment.'" Nichols v. Village of Pelham

Manor, 974 F.Supp. 243, 252 (S.D.N.Y. 1997). Here, the stated purpose of avoiding interference

with a supposedly confidential investigation is not served by the over reaching gag order

imposed on Plaintiffs. For as phrased, Plaintiffs were not only prohibited from discussing the

March 28th letter and its contents within the Department, but also externally such as with another

law enforcement agency or authority for purposes of seeking restitution for the apparent crime

committed and with members of their union -- for example to make a determination on what

avenue the union could pursue to seek such restitution.

Clearly, the order issued to Plaintiffs limited their speech in both public and non-public

forums. As a result, a heightened level of judicial scrutiny applies. Id. at 253. Simply stated,

the order in the case at bar grossly fails to meet this heightened standard – namely that the order

was narrowly drawn and necessary to protect a compelling state interest. Id.

The case law on pre-clearance regulations is also instructive. For it is in most cases that

the ban on one's First Amendment activities comes in the form of a requirement that pre-

clearance or pre-approval be sought and received. In those cases, Courts look at factors such as

the time frame within which approval is to be given and/or denied, and whether objective,

narrowly defined standards or criteria exist in making the determination as to whether to grant or

deny permission for one to speak. See, e.g., Harman v. City of New York, 140 F.3d 111 (2nd Cir.

1998); Latino Officers Association v. Safir, 170 F.3d 167 (2nd Cir. 1999); Nichols v. Village of

Pelham Manor, 974 F.Supp. 243 (S.D.N.Y. 1997).

Here, the ban on Plaintiffs' free speech, petitioning and associational activities was a total

ban as opposed to a situation where pre-approval was an option. Put differently, there were no

standards, much less ones that were narrowly defined and objective, to provide Plaintiffs with

even an option to speak out on this matter and/or seek an avenue to provide them with restitution

as potential crime victims.

Defendants' order silencing Plaintiffs was indisputably violative of the First Amendment.

For it left with the Defendants the ultimate discretion in ordering Plaintiffs to silence.

As in the cases where pre-clearance is imposed, here (and according to Defendants'

version of events) "the Chief can [and has] prevent[ed] expression based solely on what he

thinks will be the effect of the proposed expression. His discretion is not restrained by any

meaningful, objective standards." Nichols, 974 F.Supp. at 251.

Thus, even a "statute [which] required the issuance of a permit unless in the judgment of

the issuing body 'the public welfare, peace, safety, health, decency, good order, morals or

convenience required that it be refused'" was deemed unconstitutional since "these standards did

not sufficiently limit the discretion of the permit granting body. 'For in deciding whether or not

to withhold a permit, the members of the Commission were to be guided only by their own ideas

of "public welfare, peace, safety, health, decency, good order, morals or convenience."'" Id.,

citing Shuttlesworth, 394 U.S. at 149-150.

Here too, the order silencing Plaintiffs was governed by the Defendants own notion,

unsupported and without any evidentiary proof, that some type of disruption would occur within

the Department.  They do not assert disruption actually occurred. Rather, their motion is based

upon an unsupported speculation that it would occur. Simply state, their notion is nothing more than conjecture.

Moreover, the ban is not narrowly aimed at alleviating their concerns but sweeping into its preclusion public and non-public speech.

Defendants' motion must therefore be denied.

## D. Defendants' asserted legitimate justification for gagging Plaintiffs' exercise of their First Amendment rights is not supported by any proof and in any event is disputed

In addition to the legal fallacies with defendants' motion, factually there is a complete lack of support for counsel's conclusory assertions that the gag order was issued to protect some type of confidential investigation or avoid disruption to the operations of the Department.[6] Thus, even under a Pickering analysis Defendants' motion must be denied.

For once again, Defendants' argument is based on "facts" not contained in the complaint or even anywhere in the instant record since counsel's assertions remain unsupported by any documentary evidence, affidavit or other sworn statement.

Second, there is no indication in the Complaint or even in Defendants' supporting papers that any disruption actually occurred – as alluded to by counsel's submissions – and thus showing their purported concern was real as opposed to speculation.

Third, there is no indication that anyone who issued or determined to issue the gag order reasonably feared that some type of disruption would result if Plaintiffs were permitted to discuss the matters contained in the March 28th letter with an outside law enforcement agency, with their family members, with others members of the union, with each other, or with respect to any efforts they could undertake as a union to recoup the monies intended for their union.

---

[6] Furthermore, Defendants' "burden is particularly heavy where, as here, the issue is not an isolated disciplinary action taken in response to one employee's speech, but is, instead, a blanket policy designed to restrict expression by a large number of potential speakers." Harman, 140 F.3d at 118.

Fourth, there is no indication from any "evidence" that a "confidential" investigation was even taking place as Defendants' now claim. The conclusions of the ADA were sent to the Village/Town without any indication that confidentiality is being sought or maintained. And Defendants themselves do not assert that any investigation was in fact confidential.

Fifth, the only exhibit submitted in support of the Defendants' motion, namely the May 24, 2007 letter from ADA Hughes to the Town/Village, actually casts serious doubt and goes so far as to render incredible the assertion made here that the order to silence Plaintiffs was issued so as to avoid disruption during a pending investigation. The reason being that documentary exhibit shows the investigation has been concluded for more than six weeks. Yet the order silencing Plaintiffs remains in full force and effect. (Duffelmeyer Aff. ¶11; Walther Aff. ¶¶10-11; Heisler Aff. ¶11; Nardi Aff. ¶8; Carpiniello Aff. ¶6; Arce Aff. ¶11; Tancredi Aff. ¶11; DeVittorio Aff. ¶7; M. Marinelli Aff. ¶8; A. Marinelli Aff. ¶8).[7]

Thus, for each of the foregoing reasons, Defendants' motion to dismiss must be denied on the merits.

---

[7] The May 24, 2007 letter from ADA Hughes is not exactly definitive as to its conclusions, at least one of which can be readily refuted, to wit: (1) the ADA concludes that only six individuals handled the check in question, none of whom were Chief Hall, but the person who actually altered the check remains an unsolved mystery (Rienharz Aff. Ex. A, fourth page, second paragraph); (2) the ADA concludes that Chief Hall was not the President of the Chiefs of Police when this check was delivered from Brae Burn Country Club but even the advertisement receipt (which is annexed to Plaintiffs' Complaint) lists Chief Hall as President of the Association for the year 2006, which receipt is dated December 15, 2006, five days after the check was issued (see Receipt No. 1172, annexed to Complt.); (3) as to the ADA's conclusion that the Chief was not the President of the Chiefs of Police Association, the Chiefs of Police website lists Chief Hall as President of the Association for the years 2005-2006 (Berg Aff. Ex. 11, p. 7) and the Harrison Police Department website, under Chief Hall's biography, as of June 28, 2007 contains the statement that he is "Current President" of the "New York State Chiefs of Police." (Berg Aff. Ex. 12); and (4) as to the ADA's conclusion that the $2500 was for an advertisement paid for by the Chiefs Association, in fact the Chiefs of Police Association has returned the $2500.00 to the Brae Burn County Club who intends to give that money to the Harrison Police Association – the original intended recipient of the donation (Tancredi Aff. ¶¶12-13).

## POINT III

## DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY OR DIMISSAL OF THE LAWSUIT AGAINST HALL

Defendants' arguments on behalf of the individually named defendants also must be rejected.

### A. The individual defendants are not entitled to qualified immunity

Qualified immunity shields government officials from liability for civil damages when the performance of their discretionary functions "'did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Piesco, 933 F.2d at 1160. "An official does not have immunity, however, where the contours of the right were sufficiently clear that a reasonable person would understand that what he is doing violates that right." Id.

Here, Plaintiffs have sufficiently plead a violation of their First Amendment rights. And there can be no dispute that these rights were clearly established as of the time the adverse action was taken against them in 2007. *See* Points II, *supra.*

Thus, the only issue presented by Defendants' motion is whether their actions were objectively reasonable. The record here shows the opposite – namely that Defendants' concerted actions in gagging Plaintiffs was objectively unreasonable.

First, as with the argument to dismiss the First Amendment claim on the merits, Defendants claim that the individual defendants' actions were reasonable because the silence order was issued as part of a confidential investigation and to avoid disruption to the Department's operations. However, here again, there is a failure of proof submitted to support this conclusory contention made by counsel in a memorandum of law and without any supporting affidavit or other evidence.

21

Second, and more importantly, even at this stage a factual dispute exists with respect to the asserted basis upon which the "reasonableness" of Defendants' actions is being judged. For although Defendants claim the gag order was imposed due to an "open" investigation, the investigation has in fact been concluded for over six weeks. Yet the gag order remains in full force and effect. Clearly, under these circumstances, the imposition of the silence order violates the First Amendment and no reasonable official could credibly disagree with that conclusion.

Third, since no reasonable official would believe it lawful to wholesale chill the Plaintiffs ability to speak on matters of public concern in all forums in the first instance and then continue to impose the gag order even after the DA's investigation concluded, the motion on qualified immunity grounds must be denied.

And here, Defendants' unlawful motives have been clearly demonstrated by their retaliatory and threatening statements to the Plaintiffs made over the course of the past several weeks. *See* Point II(A), *supra*.

As the Second Circuit has held: "**it can never be objectively reasonable for a governmental official to act with the intent that is prohibited by law**." Locurto v. Safir, 264 F.3d 154, 169 (2nd Cir. 2001).

> "Though the qualified immunity inquiry is generally an objective one, a defendant's subjective intent is indeed relevant in motive-based constitutional torts such as the one alleged by [Plaintiff]. Otherwise, defendants in such cases would always be immunized from liability 'so long as they could point to objective evidence showing that a reasonable official could have acted on legitimate grounds.' Locurto, 264 F.3d at 169 (*quoting* Hoard v. Sizemore, 198 F.3d 205, 218 (6th Cir. 1999). Where a factual issue exists on the issue of motive or intent, a defendant's motion for summary judgment on the basis of qualified immunity must fail. Id. at 170." Johnson v. Ganim, 342 F.3d 105, 117 (2nd Cir. 2003).

*See also* Weyant v. Okst, 101 F.3d 845, 858 (2nd Cir. 1996).

This is particularly true with respect to the individual defendants here. For as police officers, they are "charged with knowledge of the law governing his or her office." And here, the