UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
WILLIAM C. DUFFELMEYER, MICHAEL
WALTHER, STEVEN HEISLER, JEFF
NARDI, STEPHEN M. CARPINIELLO,
EDWARD ARCE, RALPH TANCREDI,
PETER T. DeVITTORIO, MICHAEL
MARINELLI, and ARTHUR MARINELLI,

                Plaintiffs,

     -against-

LAWRENCE MARSHALL, individually,
DAVID HALL, individually, and the
TOWN/VILLAGE OF HARRISON, New York,

                Defendants.
------------------------------------------------------------X

**MEMORANDUM DECISION AND ORDER**

07 Civ. 2807 (GAY)

      Plaintiffs William C. Duffelmeyer, Michael Walther, Steven Heisler, Jeff Nardi, Stephen M. Carpiniello, Edward Arce, Ralph Tancredi, Peter T. DeVittorio, Michael Marinelli, and Arthur Marinelli commenced this action pursuant to 42 U.S.C. § 1983, wherein they allege that the defendants Lawrence Marshall, David Hall, and the Town/Village of Harrison, New York violated their First Amendment right to free speech. Presently before this Court is the defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP").[1] For the reasons that follow, defendants' motion is granted in full.

---

[1] This action is before me for all purposes on the consent of the parties, pursuant to 28 U.S.C. §636(c).

## I. BACKGROUND

The following facts are gathered from the parties' statements pursuant to Local Civil Rule 56.1 of the United States District Courts for the Southern and Eastern Districts of New York, from the pleadings and from affidavits, affirmations and exhibits submitted by the parties in support of their contentions. Any disputes of material fact are noted.

The Town/Village of Harrison is located in the State of New York. In 2007, the above-named plaintiffs were police officers at the Town/Village of Harrison Police Department ("HPD"). Tancredi, at the same time, was president of the Harrison Police Association ("Association"). At times relevant to the present action, Lawrence Marshall was a lieutenant and David Hall was the Chief of Police of HPD. Hall was also the president of the Chiefs of Police Association ("CPA").

In January 2007, Tancredi reviewed the donations received in December by the Association. He noticed that one of the Association's customary donors, the Brae Burn Country Club ("Club"), had not made its annual donation for 2006. Later that month, Tancredi mentioned to James Sarlo, an employee at the Club, that the Association had not received said donation. Sarlo told Tancredi that he would confer with Maria Conti[2], the comptroller of the Club. Sarlo called Tancredi at a later date and advised that the Club had written a check to the Association in early December 2006. After further investigation into the Club's bookkeeping, Sarlo called Tancredi again to inform him that the check had been altered and deposited elsewhere.

---

[2] Also identified as "Conte."

Thereafter, Tancredi spoke with Conti and Bob Meyers, then-general manager of the Club, on several occasions. In early February 2007, Conti advised Tancredi that Hall picked up from the Club the check intended for the Association. In a telephone conversation, Meyers also told Tancredi that Hall had picked up the check.

In January or February 2007, Walther, a detective at HPD, accompanied by non-party Detective Issa Kharouba, went to the Club to inquire about the missing check. Walther's visit was intended to obtain the check from the Club. A secretary at the Club advised Walther that Hall had already picked up the check. Later, Walther and Kharouba made a second trip to the Club. They spoke with Conti. Conti stated that the check, in the amount of $2500.00, had been intended for the Association, but that the payee had been altered. Thereafter, Conti faxed a copy of the altered, cashed check to Walther at HPD. At that time, plaintiffs learned that "Harrison" had been crossed out on the payee line and someone had substituted in "Chiefs". Thus, someone altered the payee name from the "Harrison Police Association" to the "Chiefs Police Association".

On March 28, 2007, plaintiffs (and non-party officers) wrote a letter ("Letter") to Anthony Marraccini, then a captain, deputy chief, and second in command at HPD. Marraccini was also HPD's internal affairs officer. Plaintiffs relayed that (1) Tancredi, as president of the Association, realized that the Club's customary donation to the Association did not come in; (2) after making inquiries to the Club, the Club and other members of the Association discovered that a check had been written to the Association but it had been altered and deposited in the account for the CPA; (3) Hall was then president of the CPA; (4) Hall picked up the Association check personally; (5) the Club did not authorize anyone, including Hall, to alter the name of the payee; (6) Walther,

3

then-vice president of the Association, asked Hall if he had any checks intended for the Association; (7) Hall said he did not have any funds or checks intended for the Association; (8) Tancredi and other members of the Association sought legal advice based on the belief that someone had intentionally altered and redirected the check; and (9) the purpose of the Letter was to notify HPD of the incident and request an investigation into the matter. They requested to be notified of the results of any investigation. They also reserved their rights, "as potential crime victims", to seek the assistance of another law enforcement agency should they be dissatisfied with the results of HPD's investigation.

The Letter also stated, "As this would constitute a criminal act, it is the understanding of the members of the [Association] with knowledge of this possible crime that we have an obligation to report the incident to [HPD]." The signatories wrote further, "We would also like to note at this time that we are making this notification due to our legal and departmental duties." In addition, they aired concern about potential retaliation by HPD's administration. Tancredi, Walther, Arce, DeVittorio, Duffelmeyer, Heisler, Carpiniello; and non-party officers—Kharouba, police officer John Audia, and detective lieutenant Douglas J. Buschel—signed the letter with their respective police department titles and badge numbers.

On March 30, 2007, Tancredi and Heisler returned to the Club. They spoke with Conti and the general manager of the Club. Conti said that Hall picked up the check intended for the Association, but could not recall if she actually saw him. The same day, Tancredi and Heisler delivered copies of the March 28, 2007 Letter to the Town Clerk for distribution to the Town Board. They also delivered a copy to Marraccini's

4

mailbox behind his desk at HPD.

Shortly after receiving the Letter, Marraccini asked Marshall, then a lieutenant at HPD, to meet with him at headquarters. Upon Marshall's arrival, Marraccini showed him the Letter and the two discussed how to investigate the matter. They drafted a list of questions ("Questionnaire"), to ask of each person who knew of the situation, in order to ascertain all the facts. Marraccini decided not to notify Hall, who was out of town at the time. The next day, Marraccini instructed Marshall to contact all the signatories of the Letter to have them come in to headquarters. The purpose was to have each of them fill out the Questionnaire. Marraccini told Marshall to have the individuals fill out the Questionnaires in different areas of the police station so that they could not confer with each other. In addition, from some responses, Marraccini and Marshall discovered that additional police officers became aware of the allegations during a dinner meeting at P.F. Chang's. Thus, Marraccini and Marshall later called in those officers, specifically Michael Marinelli and Arthur Marinelli, to fill out the Questionnaire as well.

Most of the officers arrived at the station, believing that Marshall formally issued an order to them.[3] The Questionnaire explicitly stated, "You are directed to immediately upon receipt of this order provide me with the following information and/or documentation. Your report will be completed without delay or interruption." Each of the named plaintiffs understood that if they did not comply with the order—issued by a superior—that he would be subject to disciplinary action for failing to obey a direct

---

[3] For various reasons, signatories DeVittorio, Carpiniello, Buschel, and Carruba did not come in.

order.[4]  Neither Marraccini nor Marshall further articulated this threat.  Tancredi also testified that Marraccini told him no disciplinary charges would result from the Questionnaires.

Tancredi did not understand why plaintiffs were ordered to the station.  He thought the process was atypical of an investigation in that crime victims usually volunteer statements, but are not required to do so.  Marraccini recalled that both Tancredi and Walther asked for representation in connection with filling out the Questionnaire.  Arce asked Marraccini and Marshall if he could speak with his attorney, however, he was denied said request.  Of note, the Questionnaire specifically stated, "*This is an internal affairs document you* [sic] *are prohibited from reproducing or disseminating this document or the information contained here in* [sic].  *You are directed not to discuss this investigation with any persons at this time.*"  Marraccini directly told Arce not to discuss the situation with anyone.  Both Michael Marinelli and Arthur Marinelli were also told not to discuss the investigation with anyone.  Although DeVittorio did not fill out the Questionnaire, Marshall told him that he was not to discuss the pending investigation.

On April 1, 2007, the Town/Village of Harrison Board of Trustees ("Board") met to

---

[4]  Pre-typed language on the HPD Administrative Report, on which the officers supplied answers to their Questionnaires, states in part:

> This report is made by me after being ordered to do so by lawful supervisory officers.  It is my understanding that by refusing to obey an order to write this report that I can be disciplined for insubordination and that the punishment for insubordination can be up to and including termination of employment.  This report is made only pursuant to such orders and the potential punishment/discipline that can result for failure to obey that order.

6

discuss the Letter. The Board told Marraccini that the investigation should be turned over to the Westchester County District Attorney for investigation. The Board further instructed Marraccini to cease his own investigation. Later that day, Marraccini called Hall. He informed Hall of the allegations contained in the Letter and the instructions of the Board. On April 2, 2007, Marraccini, accompanied by the Town/Village of Harrison's attorney Jonathan Kraut, turned the investigation over to the Westchester County District Attorney ("DA"). The Public Integrity Unit of the DA's office thereafter continued the investigation.

On April 6, 2007, plaintiffs filed the present action, alleging First Amendment rights violations. On April 19, 2007, the complaint appeared in the <u>Westchester Guardian</u> newspaper. On April 23, 2007, the DA interviewed both Tancredi and Walther in conjunction with its investigation. Hall went to the DA's office as well. On May 24, 2007, the DA issued a report on its investigation. Therein, it named James Sheehy as the individual who picked up the check from the Club. The DA concluded that the allegations against Hall were "simply false."

On May 24, 2007, Marraccini discussed the DA's report with Walther. Walther asked if he could now talk about the matter. Marraccini did not object. Thereafter, the DA's report was posted in the HPD locker room. On July 13, 2007, Hall issued a memorandum to all HPD employees stating that there were no restrictions on speaking about the matter. Hall stated that he issued the memorandum after learning, from plaintiffs' papers filed in this Court, that plaintiffs were unsure if they were still forbidden from speaking on the matter. Hall contends that any restrictions lifted the moment the investigation ended.

In the present action, plaintiffs claim that defendants chilled their right to free speech. Plaintiffs seek remuneration for defendants' restrictions on their speech. Specifically, plaintiffs seek compensatory and punitive damages, and attorneys' fees and costs, for the alleged violations of their rights guaranteed by the First Amendment.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FRCP 56(c). When deciding a summary judgment motion, the Court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. See McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999). The question is whether, in light of the evidence, a rational jury could find in favor of the nonmoving party. See Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). Where a plaintiff fails to establish an essential element of its claim, "there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (internal quotations and citations omitted).

Summary judgment must be denied, therefore, if the court finds "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986).

## III. FIRST AMENDMENT

The First Amendment to the United States Constitution states, "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend I. In order to prevail on a violation of First Amendment rights as a public employee, plaintiffs must prove that: (1) their speech or activity at issue was made as citizens on a matter of public concern; and, if so, (2) "whether the government entity [(HPD)] had an adequate justification for treating [them] differently from any other member of the general public." Garcetti v. Ceballos, 547 U.S. 410, 418 (2006); Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008). Cases also phrase the First Amendment retaliation test as requiring plaintiffs to prove: (1) they spoke on a matter of public concern; (2) they suffered an adverse action by their employer; and (3) a causal connection between the speech and the adverse action. See, e.g., Anderson v. State of New York, 614 F. Supp. 2d 404, 420 (S.D.N.Y. 2009) (citations omitted). Public employee plaintiffs are not "required to show that the defendants' action had an actual chilling effect" on their speech. Morrison v. Johnson, 429 F.3d 48, 51 (2d Cir. 2005).

"'Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record.'" Id. at 189 (quoting Lewis v. Cowen, 165 F.3d 154, 163 (2d Cir. 1999)). A matter of public concern is one that relates "to any matter of political, social, or other concern to the community." Connick v. Myers, 461 U.S. 138, 146 (1983). "The heart of the matter is whether the

9

employee's speech was 'calculated to redress personal grievances or whether it had a broader public purpose.'" Ruotolo, 514 F.3d at 189 (quoting Lewis, 165 F.3d at 163-64). The public employee's motive "may be one factor in making this determination, [but] it is not, standing alone, dispositive or conclusive." Sousa v. Roque, 578 D.3d 164, 175 (2d Cir. 2009).

If the public employee's speech is not a matter of public concern, then "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." Garcetti, 547 U.S. at 418 (citation omitted). However, if the speech is a matter of public concern, the Court balances the need "to promote the individual and societal interests that are served when employees speak as citizens on matters of public concern and to respect the needs of government employers attempting to perform their important public functions." Id. at 420 (citation omitted). Thus, the Court recognizes that "[a] government entity has a broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations." Id. at 418.

Here, plaintiffs contend that they wrote the Letter as crime victims and Association members rather than as police officers pursuant to their departmental duties. They further assert that the content of the letter—potential criminal activity conducted by the chief of police—is a matter of public concern because the "public has a right to know if [it] should be worried about protecting [itself] from the people who are protecting [it]." Memo. of Law in Opp. To Defs.' Mot. for Sum. Judgment at 16 [hereinafter "Pls.' Opp."]. Plaintiffs further contend that defendants' restrictions on their speech was over-broad because defendants restricted their speech as private crime

10

victims.  Id. at 18-19.

Defendants contend that plaintiffs wrote the Letter pursuant to their duties as police officers, therefore their speech was not a matter of public concern.  In support of said contention, defendants submit the following from the HPD Rules and Regulations:

- "A member of the force will report to the Chief of Police any information of a police matter, including offenses involving himself or others, and offenses with which he has been charged, except in minor traffic offenses."  Defs.' Notice of Mot. Ex. 33, HPD Rules and Regulations 1.40 [hereinafter "Defs.' Ex. ##, Rule #"].

- "Information regarding official business will be disseminated only to those for whom it is intended, in accordance with established departmental procedures."  Defs.' Ex. 36, Rule 3.01.30.

- "It is the policy of [HPD] to maintain a cooperative climate in which the news media may obtain information on matters of public interest.  However, at times, certain information must be withheld from the news media in order to protect the constitutional rights of persons involved, to avoid interfering with a departmental investigation . . . ."  Defs.' Ex. 37, Rule 5300.

Moreover, defendants contend that even if plaintiffs spoke on a matter of public concern, the restriction on plaintiffs' speech was limited to the pendency of the investigation.  As such, defendants assert that the speech restriction was tailored to enable HPD "to protect the integrity of a then-open investigation into an alleged theft."  Memo. of Law in Support of Defs.' Mot. for Sum. Judgment at 18 [hereinafter "Defs.' Memo"].

Taking into account the content, form, and context of plaintiffs' Letter, the Court concludes that the Letter did not address a matter of public concern.  Plaintiffs stated in the Letter that they (1) had "an obligation to report the incident" because they had knowledge of a possible crime; and (2) were "making this notification due to our legal

11

and departmental duties." They addressed the Letter to their superior, who was also the internal affairs officer at HPD, and left it in his office mailbox. Each officer's signature on the Letter bore his official title and badge number issued by HPD. Furthermore, plaintiffs initially did not distribute the Letter to the pubic, and only provided copies to the town clerk and town board.[5] The Letter "did not seek to inform the public that" the chief of police was suspected of stealing and forgery. See Connick, 461 U.S. at 148 (public employee did not inform the public that her employer was not discharging its governmental responsibilities and did not "seek to bring to light actual or potential wrongdoing or breach of public trust" when she circulated a questionnaire within her office). In addition, even though plaintiffs may claim that their primary motivation to write the Letter was "as potential crime victims," said motive is not dispositive or conclusive. Moreover, said motive redresses personal grievances, particularly as it relates to their interest in the recovery of the stolen funds and investigation of said crime. See Letter at 2 (Plaintiffs identify themselves once "as potential crime victims," in the context of reserving their right to pursue the matter with another law enforcement agency were they dissatisfied with HPD's investigation.).

Since plaintiffs' Letter cannot be categorized as a matter of public concern, plaintiff's have "no First Amendment cause of action" based on HPD's subsequent restriction on their speech. Garcetti, 547 U.S. at 418 (citation omitted). Moreover, even if the Letter were a matter of public concern, HPD had a substantial interest in protecting the on-going investigation and thus limit the officers' speech to each other

---

[5] The Letter became public via a newspaper reprint after the present lawsuit commenced.

protecting the on-going investigation and thus limit the officers' speech to each other and the public. As such, the Court need not address the parties' remaining claims regarding individual liability, qualified immunity, and municipal liability.

## IV. CONCLUSION

For all of the foregoing reasons, defendants' motion for summary judgment is GRANTED in full. Accordingly, plaintiffs' complaint is DISMISSED.

The Court respectfully requests that the Clerk of the Court terminate the pending motion (Docket # 47), enter judgment in favor of the defendants, and close the case.

Dated: January 29, 2010

White Plains, NY

**SO ORDERED**:

_____

GEORGE A. YANTHIS, U.S.M.J.

13